This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

    Plaintiff-Appellee,

**v.**                                   **No. 30,419**

**QUINTAN WRIGHT,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**Thomas J. Hynes, District Judge**

Gary K. King, Attorney General
Santa Fe, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Karl Erich Martell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**SUTIN, Judge.**

    Defendant Quintan Wright appeals his convictions for child abuse (negligently caused–no bodily harm) and aggravated assault (deadly weapon). On June 23, 2010,

this Court filed a notice of proposed summary disposition proposing to affirm. Defendant filed a memorandum in opposition, which we have given due consideration. We affirm Defendant's convictions.

For convenience of analysis, we consider Defendant's two issues concerning sufficiency of the evidence first, followed by the issue concerning Defendant's motion in limine.

**Issue 1:** Defendant contends that there was insufficient evidence presented at trial to support a conviction for child abuse when Defendant did nothing to the child and did not place the child in danger.

"Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (filed 1998). "In reviewing the sufficiency of evidence used to support a conviction, we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *Id.* We determine as a matter of law "whether the evidence viewed in this manner could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *State v. Apodaca*, 118 N.M. 762, 766, 887 P.2d 756, 760 (1994) (internal quotation marks and citation omitted).

Defendant was convicted of child abuse under NMSA 1978, Section 30-6-1(D) (2009), which provides as follows: [RP 178]

> Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be:
> (1) placed in a situation that may endanger the child's life or health;
> (2) tortured, cruelly confined or cruelly punished; or
> (3) exposed to the inclemency of the weather.

The New Mexico Supreme Court has interpreted the phrase "placed in a situation that may endanger the child's life or health" as requiring the State to "present evidence to prove a substantial and foreseeable risk [that the situation] endangered the child." *State v. Chavez*, 2009-NMSC-035, ¶ 27, 146 N.M. 434, 211 P.3d 891.

The jury in the present case was instructed that, to find Defendant guilty under Section 30-6-1(D), the State had to prove beyond a reasonable doubt that: (1) Defendant caused Child to be placed in a situation which endangered his life or health; (2) Defendant acted without justification and with reckless disregard; that is, that Defendant knew or should have known his conduct created a substantial and foreseeable risk, Defendant disregarded the risk, and Defendant was wholly indifferent to the consequences of the conduct and to the welfare and safety of Child; (3) Child was under the age of eighteen; and (4) this happened in New Mexico on or about July 26, 2009. [RP 45, 146] *See* UJI 14-605 NMRA.

Our review of the tape log of the trial indicates that a witness, Gail Silva, testified as follows. She observed a man and woman and a child about age two get into a car in a Smith's parking lot and begin to drive off. [RP 100-01] Three males, one of whom was wearing white pants and holding a gun, came around the side of the car, shouting. [RP 101-02] Silva identified Defendant as the man holding the gun. [RP 102] She was standing about ten feet away and heard the sliding action of the gun. [Id.]

Charles Wilson, the man who got into the car with the woman (Jessica Binder) and Child, testified next. [RP 105-06] As Binder began backing the car out of the parking place, Wilson saw the man in white pants waving a knife around. [RP 106] The man took out a gun, racked the slide, and aimed in Wilson's general direction. [RP 107] Wilson became enraged, unbuckled his seatbelt, and was going to get out, but Binder "gunned" the car and drove out onto the street. [Id.]

Binder testified that she had been in the Smith's store with Child in the cart and that Defendant and his friends began making rude comments to her. [RP 109-10] She checked out and went out to the car. [RP 110] When Defendant appeared in the parking lot, Binder saw him fling around a butterfly knife, cock a gun, and point it down, not at Wilson's face. [Id.]

Patrolman Nathan Kempton testified regarding surveillance videos he had watched. [RP 112-13] He identified Defendant as the one wearing a black shirt and white pants in the video, and he had seen a knife in Defendant's hand in the video. [RP 113]

Defendant called two witnesses at trial and testified on his own behalf. Ana Sawyer testified that she saw a man holding something black in his hand which she thought was a gun. [RP 116-17] She did not see the man raise his hand and threaten anyone with what he was holding. [Id.] Candace Archuleta testified that she had been in the store with Defendant. [RP 118] She testified that Defendant had a knife with him and had been flipping it around, but he did not have a gun. [Id.] She testified that Defendant had not been looking for a fight. [RP 119] Defendant testified that "some guy," presumably Charles Wilson, was in Jeremy's (one of the two males Defendant was with) face asking him what his problem was and said something about his girlfriend and having respect for women. [RP 118, 120] Defendant agreed that he had been playing with his knife, but testified that he did not have a gun, nor had anyone handed him one. [RP 122-23]

In *State v. McGruder*, 1997-NMSC-023, ¶ 5, 123 N.M. 302, 940 P.2d 150, *abrogated on other grounds by Chavez*, 2009-NMSC-035, the defendant had pointed a gun at the victim from a distance of about six feet and followed her around her home

as she looked for a set of truck keys. As the victim handed the defendant the keys, he threatened to kill her and held the gun to her temple while her young daughter was standing behind her. *Id.* The Supreme Court held that "[t]he jury was entitled to view such conduct as endangering either the life or health of the child." *Id.* ¶ 38. In the present case, Wilson and Binder testified that Defendant had cocked the gun and pointed it in the direction of Wilson, although not at his face, as Wilson sat in the front seat of the car with Child in the backseat. [RP 107, 110] Although Defendant testified that he did not have a gun, the jury as fact finder is not obligated to believe a defendant's testimony, to disbelieve or discount conflicting testimony, or to adopt a defendant's view. *State v. Foxen*, 2001-NMCA-061, ¶ 17, 130 N.M. 670, 29 P.3d 1071. We conclude that sufficient evidence supported Defendant's conviction for child abuse.

**Issue 3:** Defendant contends that there was insufficient evidence to support a conviction for aggravated assault given that the alleged victim was the primary aggressor during the entire encounter. [DS 4]

As instructed by the district court, to convict Defendant of aggravated assault (deadly weapon) contrary to NMSA 1978, Section 30-3-2(A) (1963), the jury had to find that: (1) Defendant threatened Wilson with a firearm; (2) Defendant's conduct caused Wilson to believe Defendant was about to intrude on his bodily integrity or

6

personal safety by touching or applying force to him in a rude, insolent, or angry manner; (3) a reasonable person in the same circumstances as Wilson would have had the same belief; (4) Defendant used a firearm; and (5) this happened in New Mexico on or about July 26, 2009. [RP 147] *See* UJI 14-302 NMRA.

As discussed earlier, there was testimony that Defendant pointed a gun in the general direction of Wilson during the encounter. There was also testimony that the three males (including Defendant) came around the side of Binder's car "shouting" and that the parties were "cussing at each other" during part of the encounter, from which the jury could conclude the confrontation was done in a "rude, insolent, or angry" manner. [RP 101]

We conclude that the jury had evidence before it contradicting the premise of this issue–that the alleged victim was the primary aggressor during the entire encounter. As described by Wilson, the incident began inside the Smith's store when the three males directed rude comments at Binder. Wilson then asked the three why they were speaking to his wife like that, and the three responded in a threatening manner. [RP 105-06] Wilson and Binder then left the store, went to their car, and prepared to drive away. At this point, Defendant approached flipping the knife and then cocking and pointing a gun at Wilson. [RP 106-07] The testimony of the State's other witnesses generally accorded with a scenario in which, after the encounter in the

7

store, Wilson and Binder attempted to leave, after which Defendant and the other two males began the threatening conduct at issue. Thus, we conclude that regardless of who initiated the encounter in the store, Defendant renewed the confrontation in the parking lot. Accordingly, we conclude that sufficient evidence supported Defendant's conviction for aggravated assault.

**Issue 2:** Defendant contends that the district court erred in allowing the jury to hear the word "gang" after the court had entered an order in limine precluding such evidence. [DS 4]

Defendant moved in limine to preclude the State from making any reference at trial to gangs or gang activity or to Tortilla Flats in particular. [RP 53-54] According to the tape log, the district court ruled that the word "gang" would be skipped over in playing the recording of the 911 call and that reference to gangs would not be made until it was relevant to the case. [RP 67] The judge also appears to have ruled that witnesses could say "Tortilla Flats" but not "gang." [Id.] At trial, the State played the 911 recording during the testimony of Gail Silva, the first witness, but did not stop the recording in time to avoid the word "gang." [DS 4] Defense counsel objected. [Id.] Following a side-bar conference, the judge sent the jury out, stating that there had been a technical difficulty. [RP 79] The docketing statement does not inform us what remedy, if any, defense counsel requested following the error. The judge excluded the

8

911 recording from the evidence, but allowed the witness to testify regarding what was said during the 911 call. [Id.] When the testimony resumed, the witness testified that she had called 911 because she had seen a gun. [Id.]

"An evidentiary ruling within the discretion of the court will constitute reversible error only upon a showing of an abuse of discretion, and a demonstration that the error was prejudicial rather than harmless." *State v. Wildgrube*, 2003-NMCA-108, ¶ 8, 134 N.M. 262, 75 P.3d 862 (internal quotation marks and citation omitted).

For several reasons, we conclude that the error, if any, was harmless. First, the actual error appears to have been on the part of the State in failing to stop the 911 playback before the word "gang" was said. Any error on the part of the district court would have arisen from the court's response to the State's failure. As noted, we are not informed what remedy Defendant sought. In any event, the testimony before and after the 911 playback contains other references to gangs and Tortilla Flats, which the jury could reasonably infer was a gang. The first witness testified before the recording was played that she recalled "one of the guys" saying "Tortilla Flats." [RP 79] Wilson's testimony, as summarized in the tape log, included "Tortilla Flats will shoot you and bury you." [RP 84] At the beginning of his testimony, Officer Kempton described himself as being employed by the FBI gang task force. [RP 90]

9

Defendant's second witness, Candace Archuleta, testified that while walking with Defendant and the two other males she heard someone yell "fuck Tortilla Flats" and that Defendant had "Tortilla Flats" tattooed on his neck. [RP 118-19] Further, the jury could have likely inferred from the nature of the confrontation as a whole that it involved gang activity. Finally, given the substantial evidence supporting Defendant's convictions as described here, we fail to see how a single inadvertent use of the word "gang" could have prejudiced him.

For the reasons stated in this opinion, we affirm the district court and Defendant's convictions.

**IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**RODERICK T. KENNEDY, Judge**